2015 COA 32

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Emmanuel C. THEUS–ROBERTS, Defendant–Appellant.**

**Court of Appeals No. 12CA0013**

Colorado Court of Appeals, Div. VII.

Announced March 26, 2015

Cynthia H. Coffman, Attorney General, Jillian J. Price, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, James S. Hardy, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE VOGT *

¶ 1 Defendant, Emmanuel C. Theus–Roberts, appeals the judgment of conviction entered on jury verdicts finding him guilty of attempted first degree murder, first degree assault, aggravated robbery, second degree assault, and two crime of violence sentence enhancers. We affirm.

## I. Background

¶ 2 According to the prosecution's evidence at trial, Theus–Roberts and another man, Josiah Parrish, got into a cab and told the driver to take them to a designated location. When they got there, Parrish got out. Theus–Roberts had the driver take him to several other locations before returning to

the initial destination approximately an hour later, running up a $90 fare.

¶ 3 Theus–Roberts gave the driver $80 in cash and told him, "I'll go inside my apartment, and I'll bring the rest of the money." Theus–Roberts came back a few minutes later, told the driver that he did not have the rest of the money but that "my friend is going to come and give you the money," and walked away. After a few more minutes, a man—identified by the driver at trial as Theus–Roberts—came to the driver's window, aimed a gun at the driver, demanded and took the $80, and shot the driver in the chest.

¶ 4 The shooter fled and the driver called 911. When the police arrived, the driver described the shooter and indicated the direction in which he had fled. Police officers found Theus–Roberts hiding in a nearby garage and arrested him. After Theus–Roberts was in custody, the police brought an eyewitness to the crime, R.M., to the place where he was being held. R.M. identified him as the man she had seen near the cab.

¶ 5 Theus–Robert was convicted of the offenses set forth above and was sentenced to a prison term totaling eighty years.

## II. R.M.'s Identification

¶ 6 Theus–Roberts contends that the trial court erred by denying his suppression motion and allowing R.M. to give testimony that was the product of an unduly suggestive out-of-court showup. We disagree.

### A. Applicable Law

¶ 7 A trial court's ruling on pretrial identification procedures presents a mixed question of fact and law. We defer to that court's findings of historical fact, but we may give different weight to those facts and reach a different conclusion in light of the legal standard. *Bernal v. People*, 44 P.3d 184, 190 (Colo. 2002); *People v. Whittiker*, 181 P.3d 264, 272 (Colo. App. 2006).

¶ 8 One-on-one showup identifications are not per se violative of due process,

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and   § 24-51–1105, C.R.S. 2014.

although the procedure is viewed with disfavor because of its strong potential for unnecessary suggestiveness. *People v. Mascarenas*, 666 P.2d 101, 109 (Colo. 1983). A one-on-one showup identification may be permissible and reasonable in situations where immediate identification would facilitate an ongoing criminal investigation. *Id.* The reasonableness of the showup procedure, however, must also be measured against the potential for irreparable misidentification. *Id.*

■■ ¶ 9 The test for determining whether an identification following a particular showup violates a defendant's due process rights is whether, under the totality of the circumstances, the identification was unreliable because the confrontation was unnecessarily and irreparably suggestive. *Id.*; *see People v. Trujillo*, 75 P.3d 1133, 1136–37 (Colo. App. 2003), *abrogation on other grounds recognized by People v. Johnson*, 121 P.3d 285 (Colo. App. 2005). The following factors are relevant in making this determination: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description of the suspect; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Trujillo*, 75 P.3d at 1136.

### B. Analysis

■ ¶ 10 R.M. lived in a house across the street from where the shooting occurred. The police officer who interviewed her and conducted the showup testified at the suppression hearing.

¶ 11 According to the officer, R.M. told him she had heard "a loud sound that sounded like a firecracker" and had looked out her window. She saw a "black male wearing dark clothing and carrying a black bag next to the taxi cab." The man "walked away from the scene at a quick pace southbound through the alley."

¶ 12 Theus–Roberts had been apprehended, and the officer decided to conduct a showup for identification purposes. Before taking R.M. to the ambulance where Theus-

Roberts was being held, the officer showed R.M. a black bag that Theus–Roberts had dropped as he fled. R.M. identified it as belonging to the person she had seen near the cab. On the way to the ambulance, the officer told R.M. that "we may or may not have a suspect in custody" and that he "would like her to tell [him] whether or not that was the person she saw near the taxi cab." The officer parked forty to fifty feet away from the ambulance and shined his spotlight on Theus–Roberts, who was wearing a white shirt and had been taken out of the ambulance by two other officers. When he was brought out of the ambulance, R.M. spontaneously said "yes, that's him." At that point, approximately one hour had elapsed since the shooting.

¶ 13 In a subsequent written statement, R.M. stated that the man she had seen was dark-skinned, but that he could have been black or Hispanic.

¶ 14 Theus–Roberts filed a motion to suppress R.M.'s identification. In addition to the suggestiveness of the confrontation, defense counsel cited the brevity of R.M.'s initial opportunity to view the suspect, the vagueness of her description, her inability to see his face, and the discrepancy between her description and the clothing Theus–Roberts was wearing.

¶ 15 After reviewing the applicable legal standards and determining that there was a need for an immediate identification in this case, the trial court concluded that, under the totality of the circumstances and upon consideration of the relevant factors, R.M.'s identification was not the product of an impermissibly suggestive procedure:

[R.M.] had an opportunity to [view] the alleged criminal at the time she was at her window. Saw him walking away from the cab. Described him as to race and granted she didn't see his face. And I don't think that's significant, although it may be an interesting subject for cross-examination. I don't think it is controlling.

She was paying attention to what she saw. It was late at night. There was unusual noise outside. She saw someone walking away rapidly from a cab that was sitting still in the middle of the street. Her prior

description of the ... suspect was essentially consistent with that that she made thereafter.

Her level of certainty was very certain. She was absolutely positive it was the same person and that, I think, is significant. And I think it is positive that her positive indication was made immediately without any questioning. And the time elapsed between the crime and the ID, an hour, which I don't find to be unusual or inappropriate.

So for all those reasons based on the totality of the circumstances, I believe the identification in this case was not constitutionally suspect or impermissibly suggestive. I'm going to deny the motion to suppress.

¶ 16 The trial court applied the correct standard in deciding the issue before it; its findings are supported by the testimony at the hearing; and we agree that, under the totality of the circumstances, the identification was not unreliable. We are not persuaded by Theus–Roberts' contentions on appeal that the procedures accompanying the show-up and the deficiencies in R.M.'s identification of him require a contrary conclusion. The record does not show that anything the police did or failed to do led R.M. to make an unreliable identification. Further, at trial, Theus–Roberts cross-examined R.M. extensively about facts that could call into question the reliability of her identification, thus allowing the jury to determine how much to credit that identification. *See People v. Monroe*, 925 P.2d 767, 772 (Colo. 1996) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977))).

## III. Eyewitness Identification Testimony Instructions

¶ 17 Theus–Roberts tendered three jury instructions that, in accordance with the reasoning in *United States v. Telfaire*, 469 F.2d 552 (D.C. Cir. 1972), would have provided guidance on evaluating the reliability of eyewitness identification testimony. The trial

court did not err in refusing to give the instructions.

### A. Applicable Law

¶ 18 We review jury instructions de novo to determine whether the instructions as a whole accurately inform the jury of the governing law. *People v. Vecellio*, 2012 COA 40, ¶ 30, 292 P.3d 1004. If they do, the trial court has substantial discretion in formulating the instructions and deciding whether additional instructions are required. *See id.*; *People v. Renfro*, 117 P.3d 43, 48 (Colo. App. 2004).

¶ 19 The Colorado Supreme Court has consistently held that it is not error for a trial court to refuse tendered *Telfaire* instructions when the jury receives a general instruction on the credibility of witnesses. *See Campbell v. People*, 814 P.2d 1, 5 n.8 (Colo. 1991) (collecting cases), *abrogated on other grounds by People v. Shreck*, 22 P.3d 68 (Colo. 2001).

### B. Analysis

¶ 20 Theus–Roberts asked the trial court to give three *Telfaire* instructions to assist the jurors in evaluating the credibility of the witnesses who had identified him as the shooter. The trial court declined to do so, observing that the instructions had never been approved for use in Colorado, that they overemphasized one aspect of the evidence, that the pattern instructions on credibility and assessment of the evidence were "thorough, complete, and clear," and that Theus–Roberts could argue any weaknesses in the eyewitness identification testimony. The court gave the pattern witness credibility instruction:

You may decide what testimony to believe. You should carefully consider all of the testimony given and the circumstances under which each witness has testified.

Consider each witness' knowledge, motive, state of mind, demeanor, and manner while on the stand. Consider the witness' means of knowledge, ability to observe, and strength of memory. Consider also any relationship each witness may have to either side of the case; the manner in which

each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case. You should consider all facts and circumstances shown by the evidence which affects the credibility of the witness' testimony.

. . . . .

You may believe all of the testimony of any witness, or part of it, or none of it.

¶ 21 Having given the pattern witness credibility instruction, which accurately informed the jury of the governing law, the trial court did not err in refusing Theus–Roberts' additional tendered instructions. *See Campbell*, 814 P.2d at 5 n.8. Although Theus–Roberts contends that "scientific advancements demonstrate the general credibility instruction does not suffice in cases in which eyewitness identification is a material, disputed issue," we do not view this case as warranting a departure from controlling Colorado Supreme Court precedent, which is binding on us in any event.

## IV. Officer's Testimony

¶ 22 Theus–Roberts next contends that the trial court erroneously admitted irrelevant and prejudicial expert testimony from a lay witness when it allowed a police officer to testify about gunshot residue (GSR) testing and fingerprint recovery. We disagree.

### A. Standard of Review

¶ 23 Whether to admit evidence is a matter committed to the discretion of the trial court, whose ruling will not be disturbed unless it was manifestly arbitrary, unreasonable, or unfair. *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003).

¶ 24 If the defendant objected to the admission of the evidence, we review for harmless error; under this standard, an error is harmless if it did not substantially influence the verdict or affect the fairness of the trial. *People v. Reed*, 2013 COA 113, ¶ 43, 338 P.3d 364. If the defendant did not object, or objected on grounds different from those raised on appeal, we review for plain error, which is error that is both obvious and substantial and that so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Ujaama*, 2012 COA 36, ¶ 37, 302 P.3d 296; *see also People v. Miller*, 113 P.3d 743, 750 (Colo. 2005).

### B. Applicable Law

¶ 25 Relevant evidence, that is, evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," is admissible unless otherwise provided by constitution, statute, or rule. CRE 401, 402.

¶ 26 A party may present relevant evidence through the testimony of expert witnesses or lay witnesses in accordance with the standards set forth in CRE 701 and 702. Under CRE 701, a witness not qualified as an expert may offer opinion testimony only if it is rationally based on the perception of the witness, helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of CRE 702. *See People v. Rincon*, 140 P.3d 976, 982 (Colo. App. 2005) (lay opinion testimony permissible if opinion is not based on specialized knowledge but, rather, could be reached by average person having been in same position as witness).

¶ 27 Police officers regularly and appropriately offer lay opinion testimony under CRE 701 based on their perceptions and experiences. *People v. Stewart*, 55 P.3d 107, 123 (Colo. 2002); *People v. Conyac*, 2014 COA 8M, ¶ 58, 361 P.3d 1005. However, when a police officer's testimony requires the application of, or reliance on, specialized skills or training, the officer must be qualified as an expert under CRE 702 before offering such testimony. *Stewart*, 55 P.3d at 123; *Conyac*, ¶ 58.

### C. Analysis

¶ 28 Before the police officer testified, the jury had heard a forensic expert opine on possible explanations for the absence of GSR on Theus–Roberts' hands and jacket. Another expert had testified that no

identifiable fingerprints were recovered from the cab or the gun in Theus–Roberts' bag and had offered reasons explaining why such prints might not be found.

¶ 29 The officer who requested the GSR and latent fingerprint tests then testified as a lay witness. When the prosecutor asked him about his experience with GSR testing and inquired how often, in his experience, such testing yielded a positive result, defense counsel objected on relevance grounds. The objection was overruled and the witness testified:

> With my experience over the 16 years that I've been a police officer and the investigative experience that I've had, I've never had a positive result to GSR. I do have knowledge that other detectives, particularly one detective ... that I work with in the Homicide Unit, I believe he did have one positive test.

The officer also testified, without objection, that in his previous investigations he had never personally "experienced a recovery of a latent fingerprint from a firearm."

¶ 30 We find no grounds for reversal based on the officer's testimony. Although Theus–Roberts objected at trial, and argues on appeal, that the testimony was irrelevant, it was relevant to show that the absence of GSR and fingerprint evidence was not necessarily exculpatory. *See* CRE 401.

¶ 31 Further, even if we assume that the officer's testimony was sufficiently based on specialized knowledge that he should have been offered as an expert, there was no plain error. The officer was qualified by his experience and training to testify about GSR and fingerprint testing; his testimony was brief; and it was cumulative of the testimony of experts who had already testified, in detail and without objection, about why GSR or latent fingerprint tests might be negative. *See Stewart,* 55 P.3d at 124–25 (allowing police officer to testify without qualifying him as expert was harmless error where his testimony was corroborated by other evidence); *People v. Warrick,* 284 P.3d 139, 145–46 (Colo. App. 2011) (no plain error in allowing officer to testify as lay witness about lie detection techniques, where officer was qualified to offer such testimony).

## V. Complicity Theory of Liability Instruction

¶ 32 Theus–Roberts further contends that the trial court erred in instructing the jury, over his objection, on complicity. He argues that there was insufficient evidence to support such an instruction. Again, we disagree.

### A. Applicable Law

¶ 33 Whether sufficient evidence supports a requested jury instruction is a question of law that we review de novo. *People v. Rios,* 2014 COA 90, ¶ 42, 338 P.3d 495. We view the evidence in the light most favorable to the giving of the instruction. *Id.*

¶ 34 If the evidence presented establishes that two or more persons were jointly engaged in the commission of a crime, then it is appropriate for the trial court to instruct the jury on complicity. *People v. Osborne,* 973 P.2d 666, 669 (Colo. App. 1998); *see People v. Chavez,* 190 P.3d 760, 768 (Colo. App. 2007) (when two or more persons are involved in the commission of a crime, one charged as a principal may be tried and convicted as a complicitor).

¶ 35 Complicity is a legal theory by which an accomplice may be held criminally liable for a crime committed by another person if, with the intent to promote or facilitate the commission of the offense, the accomplice aids, abets, advises, or encourages the principal in planning or committing the offense. § 18–1–603, C.R.S. 2014. To establish responsibility under the complicity statute, the prosecution must prove that (1) the principal committed the crime; (2) the complicitor knew that the principal intended to commit the crime; and (3) the complicitor, having the requisite knowledge, aided, abetted, or encouraged the principal in the commission of the crime. *People v. Wheeler,* 772 P.2d 101, 103 (Colo. 1989).

### B. Analysis

¶ 36 The prosecution charged Theus–Roberts as a principal and presented evidence that it was he who shot the driver.

It also requested an instruction on complicity, arguing that, if the jury believed that Parrish was the shooter, it should still be able to find Theus–Roberts liable as a complicitor based on his having "set up the scenario." The trial court concluded that sufficient evidence had been presented to warrant instructing the jury on complicity.

¶ 37 We agree with the trial court. The jury heard evidence that the call to order the cab, made by a person who identified himself as Emmanuel, was placed from a cell phone belonging to Parrish's mother; that Parrish and Theus–Roberts were the two passengers in the cab; that the driver was asked to, and did, drop Parrish at a location near his apartment and was later directed by Theus–Roberts to return to that location; that Theus–Roberts told the driver that his friend would come to the cab and give the driver the balance of the fare; and that a man subsequently appeared at the cab window, demanded money, and shot the driver. Although R.M. identified the man standing by the cab as Theus–Roberts, she did not see his face; and the jury could have believed that she in fact had seen Parrish, whose physical appearance was described as similar to that of Theus–Roberts.

¶ 38 Viewed in the light most favorable to the giving of the instruction, the evidence was sufficient to permit the jury to conclude that Parrish was the shooter and that Theus–Roberts intended to, and did, aid and abet Parrish in setting up the crime. Thus, the trial court did not err in instructing the jury on complicity. In any event, any error in giving the complicity instruction would not warrant reversal where, as here, there is no contention that the evidence was insufficient to support Theus–Roberts' conviction as a principal. *See People v. Dunaway,* 88 P.3d 619, 631 (Colo. 2004); *People v. Rowe,* 2012 COA 90, ¶ 28, 318 P.3d 57.

## VI. Cumulative Error

¶ 39 Because the alleged errors of which Theus–Roberts complains did not, even considered cumulatively, deprive him of a fair trial, he is not entitled to relief on a theory of cumulative error. *See People v. Roy,* 723 P.2d 1345, 1349 (Colo. 1986).

¶ 40 The judgment is affirmed.

JUDGE NAVARRO concurs.

JUDGE BERGER specially concurs.

JUDGE BERGER specially concurring.

¶ 41 The Colorado Supreme Court consistently has held that it is not error for a trial court to refuse to give special credibility or reliability instructions with respect to eyewitness identifications when the jury is properly instructed generally on the credibility of witnesses. *See People v. Fuller,* 791 P.2d 702, 707 (Colo. 1990); *People v. Lopez,* 182 Colo. 152, 511 P.2d 889 (1973). We are bound by these supreme court decisions. For these reasons, I join the court's opinion in full. However, I write separately to express my concerns about the use, under certain circumstances, of eyewitness identification evidence against criminal defendants.

### I.

¶ 42 Eyewitness identifications of perpetrators of criminal offenses always have been and presumably always will be a fundamental part of our criminal justice system. By its very nature, eyewitness identification testimony is compelling and many convictions depend entirely or primarily on eyewitness identifications. "[T]here is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders,* 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting) (quoting Elizabeth Loftus, *Eyewitness Testimony* 19 (1979)).

¶ 43 Yet, the available science instructs us that, at least under certain circumstances, eyewitness identifications can be grievously wrong.[1] As a justice of the United States

---

1. A bill addressing some of the problems with eyewitness identifications is currently being considered by the General Assembly. "Concerning Statewide Policies and Procedures for Law Enforcement Agencies that Conduct Eyewitness Identifications," S. 15–058, 70th Gen. Assemb., 1st Reg. Sess. (Colo. 2015). The summary of the bill states: "The bill requires all Colorado law

Supreme Court recently recognized, "[t]he empirical evidence demonstrates that eyewitness misidentification is the single greatest cause of wrongful convictions in this country." *Perry v. New Hampshire*, 565 U.S. ——, ——, 132 S.Ct. 716, 738, 181 L.Ed.2d 694 (2012) (Sotomayor, J., dissenting) (internal quotation marks omitted). "Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by postevent information or social cues; that jurors routinely overestimate the accuracy of eyewitness identifications; that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy." *Id.* at 738–39 (footnotes omitted); *see also* Amy D. Trenary, Comment, *State v. Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U. Colo. L.Rev. 1257 (Fall 2013).

¶ 44 DNA exoneration statistics compiled by the Innocence Project indicate that seventy-five percent of wrongful conviction cases involved false eyewitness identifications. *State v. Romero*, 191 N.J. 59, 922 A.2d 693, 702 (2007). Equally troubling are statistics that show that thirty-six percent of misidentifications involved multiple witnesses identifying the same wrong person. *State v. Henderson*, 208 N.J. 208, 27 A.3d 872, 886 (2011); *see generally* Trenary, 84 U. Colo. L.Rev. at 1257.[2] Cross-racial identifications are particularly problematic because studies suggest that "eyewitnesses are superior at identifying persons of their own race and have difficulty identifying members of another race." *Romero*, 922 A.2d at 698 (internal quotation marks omitted); *see also* Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identifications, and the Limits of Cross–Examination*, 36 Stetson L.Rev. 727, 760 (Spring 2007) ("The United States

Supreme Court has acknowledged that race 'counts' in making accurate identifications." (citing *Manson v. Brathwaite*, 432 U.S. 98, 115, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977))).

¶ 45 The United States Supreme Court recently considered the issue of eyewitness identification evidence when it decided whether the federal constitution requires a court to screen for reliability all eyewitness identifications rather than just those identifications that are procured through suggestive law enforcement techniques or procedures. *Perry*, 566 U.S. ——, 132 S.Ct. 716. While answering that question in the negative, the Court recognized the need for procedural mechanisms to test the reliability of eyewitness identifications, stating:

> When no improper law enforcement activity is involved, we hold, *it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably*, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and *jury instructions on* both *the* fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id.* at ——, 132 S.Ct. at 721 (emphasis added).

¶ 46 Thus, in holding that "[t]he fallibility of eyewitness evidence" does not "alone render its introduction at the defendant's trial fundamentally unfair," *Perry* took "account of [existing] safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability." *Id.* at ——, 132 S.Ct. at 728. Such safeguards included "[e]yewitness-specific jury instructions [that] warn the jury to take care in appraising identification evidence." *Id.* at ——, 132

enforcement agencies ... to adopt, on or before July 1, 2016, written policies and procedures ... relating to eyewitness identifications." *Id.* The proposed statute includes the legislative declaration that "[o]ver the past forty years, a large body of peer-reviewed scientific research and practice has demonstrated that simple systematic changes in the administration of eyewitness identification procedures by all law enforcement agencies can greatly improve the accuracy of those identifications." *Id.*

The bill does not address whether a special jury instruction should be given when eyewitness identification testimony is a substantial part of the evidence in a criminal case.

**2.** These statistics are based upon a population that, by definition, consists of those wrongfully convicted. As a result, the statistics do not provide any information about the percentage of total convictions affected by potentially unreliable eyewitness identifications.

S.Ct. at 728–29. According to *Perry*, in 2012, eight federal circuits (including the Tenth), and seventeen states, including New Jersey, Arizona, Massachusetts, New York, Pennsylvania, Kansas, and Maryland, required, under varying circumstances, a special jury instruction regarding eyewitness identifications. *See id.* at 728 n.7 (collecting jury instructions).[3]

¶ 47 Accordingly, while I recognize that we are bound by the supreme court's prior decisions on this issue, I believe it is important to note how much time has elapsed since the supreme court last visited this subject. The supreme court's earlier cases do not analyze in depth the scientific, judicial, and scholarly work that casts doubt on the reliability of certain eyewitness identifications because much of this body of work did not exist at the time the court addressed this issue.

## II.

¶ 48 Given the significant empirical evidence that now exists on the unreliability of some eyewitness identifications, I question whether a general credibility of witnesses instruction is up to the task when applied to at least certain types of eyewitness identification evidence. *See* COLJI–Crim. E:05 (2014); *see also State v. Mann*, 274 Kan. 670, 56 P.3d 212, 222 (2002) ("The reliability

of the identification and credibility of an eyewitness are not the same thing."). In the vast majority of false eyewitness identifications, the problem is not the mendacity of the witnesses; most of the time the witnesses are acting in good faith and genuinely believe, or even are certain, that they have identified the perpetrator of the crime.[4] Yet they are wrong a troubling percentage of the time.

¶ 49 The accuracy, or inaccuracy, of eyewitness identification testimony rests more upon the workings of the human brain than the typical factors that are addressed in the general credibility instruction. Much of this is not intuitive (and some of it actually is counterintuitive). *See, e.g., Commonwealth v. Gomes*, 22 N.E.3d 897, 909, 470 Mass. 352 (2015). Most persons, and virtually all lay jurors, have no knowledge or experience in this area. As the Connecticut Supreme Court has stated: "[W]hile science has firmly established the inherent unreliability of human perception and memory, ... this reality is outside the jury's common knowledge and often contradicts jurors' commonsense understandings." *State v. Guilbert*, 306 Conn. 218, 49 A.3d 705, 723 n.22 (2012) (internal quotation marks omitted).

¶ 50 Coupled with the law in Colorado that trial courts possess wide discretion to ex-

---

**3.** "See Model Crim. Jury Instr. No. 4.15 (CA3 2009); *United States v. Holley*, 502 F.2d 273, 277–278 (C.A.4 1974); Pattern Crim. Jury Instr. No. 1.29 (CA5 2001); Pattern Crim. Jury Instr. No. 7.11 (CA6 2011); Fed. Crim. Jury Instr. No. 3.08 (CA7 1999); Model Crim. Jury Instr. for the District Courts No. 4.08 (CA8 2011); Model Crim. Jury Instr. No. 4.11 (CA9 2010); Crim. Pattern Jury Instr. No. 1.29 (CA10 2011); Pattern Jury Instr. (Crim. Cases) Spec. Instr. No. 3 (CA11 2010); Rev. Ariz. Jury Instr., Crim., No. 39 (3d ed. 2008); 1 Judicial Council of Cal. Crim. Jury Instr. No. 315 (Summer 2011); Conn. Crim. Jury Instr. 2.6–4 (2007); 2 Ga. Suggested Pattern Jury Instr. (Crim. Cases) No. 1.35.10 (4th ed. 2011); Ill. Pattern Jury Instr., Crim., No. 3.15 (Supp. 2011); Pattern Instr., Kan.3d, Crim., No. 52.20 (2011); 1 Md. Crim. Jury Instr. & Commentary §§ 2.56, 2.57(A), 2.57(B) (3d ed. 2009 and Supp. 2010); Mass. Crim. Model Jury Instr. No. 9.160 (2009); 10 Minn. Jury Instr. Guides, Crim., No. 3.19 (Supp. 2006); N.H. Crim. Jury Instr. No. 3.06 (1985); N.Y. Crim. Jury Instr. 'Identification—One Witness' and 'Identification—Witness Plus' (2d ed. 2011); Okla. Uniform Jury Instr., Crim., No. 9–19

(Supp. 2000); 1 Pa. Suggested Standard Crim. Jury Instr. No. 4.07B (2d ed. 2010); Tenn. Pattern Jury Instr., Crim., No. 42.05 (15th ed. 2011); Utah Model Jury Instr. CR404 (2d ed. 2010); Model Instructions from the Vt.Crim. Jury Instr. Comm. Nos. CR5–601, CR5–605 (2003); W. Va. Crim. Jury Instr. No. 5.05 (6th ed. 2003)." *Perry v. New Hampshire*, 565 U.S. ——, —— n.7, 132 S.Ct. 716, 728 n.7, 181 L.Ed.2d 694 (2012).

**4.** Indeed, the certainty of the witnesses' identification is a factor in determining whether the admission of the identification evidence is constitutionally permissible. *See, e.g., People v. Aguirre*, 839 P.2d 483, 485 (Colo. App. 1992) ("[T]he factors to be considered in evaluating" whether "[a]n out-of-court identification procedure is impermissibly suggestive [because] there is a substantial likelihood of misidentification" include "the witness' level of certainty."). Scientific studies demonstrate, however, that there is little, if any, correlation between the certainty of the witness regarding the identification and its accuracy. *See, e.g., Commonwealth v. Gomes*, 22 N.E.3d 897, 911–12, 470 Mass. 352 (2015).

clude expert testimony regarding the reliability of eyewitness identifications in general, *see, e.g., People v. Kemp,* 885 P.2d 260, 262–63 (Colo. App. 1994), the failure to tell jurors what scientists have taught us regarding the potential unreliability of some eyewitness identification evidence may result in wrongful convictions that could have been prevented if jurors were informed of the fallible nature of this type of evidence. *Cf. State v. Clopten,* 223 P.3d 1103, 1113 (Utah 2009) ("We expect ... that in cases involving eyewitness identification of strangers or near-strangers, trial courts will routinely admit expert testimony [on the dangers of such evidence].").[5]

¶ 51 Because much of the relevant scientific data and judicial thinking has been accumulated after the Colorado Supreme Court last addressed this issue, reconsideration of the issue seems timely and appropriate.[6] Accordingly, while I join the court's opinion in full, I believe that it is important to recognize the potential issues raised in some criminal cases by the admission of eyewitness identification evidence unaccompanied by any sort of cautionary instruction.

**5.** I do not address whether any need for special reliability jury instructions would be obviated if trial courts were required, under certain circumstances, to admit (if proffered) expert testimony regarding the reliability of eyewitness identifications.

**6.** The many nuances of this inquiry include (1) whether special eyewitness identification instructions ever should be given to juries; (2) if they are to be given, what circumstances trigger the requirement for such instructions, for example, whether the instructions would be required only when: (a) the eyewitness identification is the only or the central evidence of guilt, *see, e.g., United States v. Greene,* 591 F.2d 471, 479 (8th Cir. 1979); *State v. Long,* 721 P.2d 483, 492 (Utah 1986); (b) the witness did not previously know the identified perpetrator, *cf. State v. Saenz,* 271 Kan. 339, 22 P.3d 151, 161 (2001); or (c) there is no independent corroborating evidence of the eyewitness identification, *see, e.g., People v. Wright,* 45 Cal.3d 1126, 248 Cal.Rptr. 600, 755 P.2d 1049, 1059 (1988); and (3) whether any requirement to give such instructions should be applied only prospectively or retroactively as well. Because the focus of this concurrence is merely to point out the advisability of reconsidering the issue, I do not address or attempt to resolve any of these questions here.