2015 COA 37

**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**Mario Joseph MARTINEZ,**
**Defendant–Appellant.**

**Court of Appeals No. 12CA1093**

Colorado Court of Appeals,
Div. V.

Announced April 9, 2015

Rehearing Denied June 4, 2015

---

Cynthia H. Coffman, Attorney General, Deborah Isenberg Pratt, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, State Public Defender, Kielly Dunn, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE GRAHAM

¶ 1 Defendant, Mario Joseph Martinez, appeals his convictions for attempted first degree criminal trespass and other offenses, as well as the district court's restitution order. We affirm his convictions, but vacate the restitution order in part and remand with directions.

## I. Background

¶ 2 The victim awoke one morning at about 3:00 a.m. to a noise outside her second-floor bedroom. She walked to the adjoining bathroom and saw a man standing on her roof, trying to enter the bathroom window. She tried to scream, but was so startled she barely made a sound. Seeing the victim, the man ran away.

¶ 3 The victim called the police. Officer Lesh arrived a short time later and found defendant hiding in a row of bushes near the victim's house. He ordered defendant to come out of the bushes, and noticed defendant had a pronounced limp when he stepped on his right foot. Officer Lesh arrested defendant and asked whether he was okay. Defendant replied that he had twisted his ankle while jogging.

¶ 4 While defendant waited in Officer Lesh's patrol car, Detective McGee spoke with the victim, who agreed to view defendant to determine whether he was the man she saw at her window. Officer Lesh removed defendant from the patrol car, and the victim made a positive identification.

¶ 5 Defendant was then transported to the hospital, where he was examined by Dr. Stafford. Dr. Stafford diagnosed defendant with a fractured right heel, and told Officer Lesh the injury could have been caused by a fall, but was inconsistent with twisting an ankle.

¶ 6 At trial, defendant was convicted of attempted first degree criminal trespass,[1] third degree criminal trespass,[2] and criminal mischief.[3] The district court sentenced defendant to three years in community corrections and ordered restitution in the amount of $16.95 for the cost of replacing the window screen he damaged and $489 for the cost of installing bars on the window he tried to enter.

¶ 7 Defendant filed this appeal, arguing that (1) the district court erred when it admitted evidence that the victim identified him at the scene and allowed her to identify him again at trial; (2) Dr. Stafford's testimony regarding defendant's injuries violated the physician-patient privilege; and (3) the court erred in awarding restitution for the cost of

---

1. A Class 6 felony under §§ 18–4–502 and 18–2–101, C.R.S.2014.

2. A Class 1 petty offense under § 18–4–504(1), C.R.S.2014.

3. A Class 2 misdemeanor under § 18–4–501, C.R.S.2014.

installing bars on the victim's window. We address these arguments in turn.

## II. Showup

¶ 8 Defendant first claims the district court erred when it admitted evidence that the victim previously identified him as the man she saw in her window and allowed her to identify him again at trial. We conclude there was no error, but even if there was, it was harmless beyond a reasonable doubt.

### A. Standard of Review

¶ 9 We review the constitutionality of pretrial identification procedures as a mixed question of law and fact. *Bernal v. People*, 44 P.3d 184, 190 (Colo.2002); *People v. Howard*, 215 P.3d 1134, 1136 (Colo.App.2008). We give deference to the trial court's findings of fact, but we may give different weight to those facts and may reach a different conclusion in light of the legal standard. *Bernal*, 44 P.3d at 190; *Howard*, 215 P.3d at 1136.

¶ 10 The parties agree this is an issue of constitutional dimension and that defendant preserved it. Therefore, if the district court erred, we apply the constitutional harmless error standard to determine whether reversal is required. *Hagos v. People*, 2012 CO 63, ¶ 11, 288 P.3d 116. Under this standard, the prosecution must show the error was harmless beyond a reasonable doubt. *Id.* If there is a reasonable possibility the error contributed to the conviction, we will reverse. *Id.*

### B. Relevant Law

¶ 11 Identification procedures that are so unnecessarily suggestive as to render the identification unreliable violate due process. *Manson v. Brathwaite*, 432 U.S. 98, 114–16, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *People v. Weller*, 679 P.2d 1077, 1083 (Colo. 1984). One-on-one showups are disfavored because they tend to be suggestive, but they

are not per se invalid.[4] *People v. Smith*, 620 P.2d 232, 237 (Colo.1980). A showup violates due process if, under the totality of the circumstances, it creates "a very substantial likelihood of irreparable misidentification." *Manson*, 432 U.S. at 116, 97 S.Ct. 2243 (internal quotation marks omitted); *see also Smith*, 620 P.2d at 237. The factors for a court to consider in making this determination are: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description of the criminal; (4) the level of certainty demonstrated at the time of the identification; and (5) the time between the crime and the identification. *Smith*, 620 P.2d at 238.

### C. Analysis

¶ 12 The district court denied defendant's motion to suppress without making detailed findings of fact and conclusions of law. Nevertheless, we believe there is sufficient evidence in the record to support its decision and further conclude that any error was harmless beyond a reasonable doubt.

¶ 13 According to the testimony at the suppression hearing, Officer Lesh responded to the victim's home after receiving a report of a possible burglary in progress. The reporting party (who he later learned was the victim) described the suspect as a slender male with a round face and short hair (or bald) who stood between 5 feet, 6 inches and 5 feet, 10 inches tall. Shortly after Officer Lesh arrived, he found defendant, who matched the victim's description, hiding in some bushes near the house. Officer Lesh and Detective McGee conducted the showup less than twenty-five minutes later. During the showup, the victim and Detective McGee stood approximately twenty-five feet away from defendant while Officer Lesh illuminated defendant's face with a flashlight. Within a few seconds, the victim told Detective McGee that she believed he was the person

---

4. In fact, returning a suspect to the scene of the crime for immediate identification may be good police practice. A timely showup " 'fosters the desirable objectives of fresh, accurate identification which in some instances may lead to immediate release of an innocent suspect and at

the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.' " *People v. Smith*, 620 P.2d 232, 237 (Colo.1980) (quoting *People v. Williams*, 183 Colo. 241, 245, 516 P.2d 114, 115 (1973)).

she saw on her roof. · Detective McGee did not make· any suggestive comments during the procedure:.

¶ 14 Although the district court did not consider all of the enumerated factors in its findings, it did consider several, and the record discloses evidence that supports others. The court found that "the witness had a good opportunity· to view the perpetrator," there was no "suggestive procedure," and that the victim identified defendant "without hesitation or reservation." The suppression record also reveals that the victim had enough opportunity to view the suspect to see he was slender; short in stature, and had a round face with short hair (or was balding); and that a relatively brief twenty-five minutes elapsed from the victim's sighting to the showup. The record is sufficient to establish that the showup did not create a substantial likelihood of misidentification. Therefore, the district court did not err in denying defendant's motion to suppress the identification evidence.

¶ 15 Even if we were to conclude the district court erred, it would not warrant reversal. According to the evidence presented at trial,[5] the victim saw a man who generally matched defendant's description standing on her roof, trying to enter her second floor window. Minutes later, Officer Lesh found defendant hiding in the bushes next to the victim's home with an injured foot and an implausible explanation (that he twisted his ankle while jogging at 3:00 a.m.). Even without the victim's identification, there was substantial evidence that defendant was the person she saw in her window. Any error in admitting the identification evidence was therefore harmless beyond a reasonable doubt. *See Hagos*, ¶ 11.

### III. Dr. Stafford's Testimony

¶ 16 Defendant next argues the district court erred when it allowed Dr. Stafford to testify because he did not waive the physician-patient privilege. We conclude otherwise.

### A. Standard of Review

¶ 17 The parties disagree on the applicable standard of review. Defendant asks us to review the district court's decision de novo, while the People encourage us to review for abuse of discretion. We agree with defendant. The physician-patient privilege is a creature of statute, and we review a district court's interpretation of statutes de novo. *Adolescent & Family Inst. of Colo., Inc. v. Colo. Dep't of Human Servs.*, 2013 COA 44, ¶ 16, 316 P.3d 4.

¶ 18 The parties agree this nonconstitutional issue was preserved, so we further review any error for harmless error. *See Hagos*, ¶ 12. Under this standard, we reverse only if the error affects defendant's substantial rights, meaning it "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (internal quotation marks omitted).

### B. Relevant Law

¶ 19 The physician-patient privilege provides, in pertinent part: "A physician ... shall not be examined without the consent of his or her patient as to any information acquired in attending the patient that was necessary to enable him or her to prescribe or act for the patient...." § 13–90–107(1)(d), C.R.S.2014. We narrowly construe the privilege because it withholds potentially relevant information. *Hartmann v. Nordin*, 147 P.3d 43, 49 (Colo.2006). The party who asserts the privilege bears the burden of establishing that it applies in the first instance. *Id.* Once the privilege attaches, the burden is placed upon the challenging party to establish a waiver. *Id.* at 51. ·

¶ 20 Section 12–36–135, C.R.S.2014, known as the "reporting statute," creates an exception to the physician-patient privilege. *See People v. Covington*, 19 P.3d 15, 21 (Colo. 2001). A physician who treats an injury that he "has reason to believe involves a criminal act" has a duty to report the injury to the

---

**5.** · In determining whether the court erroneously denied defendant's motion to suppress, we confine our review to the testimony developed at the suppression hearing. *Moody v. People*, 159 P.3d 611, 613 (Colo.2007). ·However, we may consider the entire record to determine whether an error was harmless. *See People v. ·Bowers*, 801 P.2d 511, 518 (Colo.1990).

police. § 12–36135(1)(a). This section abrogates the privilege "as to the medical examination and diagnosis ... but not as to any statements made by the patient...." § 12–36–135(3).

### C. Analysis

■ ¶ 21 Dr. Stafford's testimony did not violate the physician-patient privilege. Dr. Stafford had reason to believe defendant's injury involved a criminal act because defendant was in police custody during the examination and Dr. Stafford was required to sign discharge papers so defendant could be escorted to jail. It did not require a quantum leap of logic for the doctor to discern that defendant might well have been injured as the result of a criminal episode. Dr. Stafford testified that he diagnosed defendant with a fractured heel bone and gave a very general opinion about possible causes of the injury. Because he had reason to believe defendant's injury involved a criminal act, his testimony was limited to his examination and diagnosis, and he did not disclose any statements defendant made in the course of his treatment, Dr. Stafford's testimony fell within the exception created by the reporting statute. See § 12–36–135(1)(a), (3).

¶ 22 Defendant argues that the reporting statute does not apply because (1) Dr. Stafford provided solicited, rather than unsolicited, information to police; and (2) defendant's injuries were caused by his own criminal conduct rather than another's. This argument finds no support in the law.

¶ 23 First, the fact that police requested information from Dr. Stafford has no bearing on whether the reporting statute applies. In *Covington*, 19 P.3d 15, a physician assistant, acting at the direction of police, took photographs of a victim's gunshot wounds while she was in the emergency room. *Id.* at 18. The Colorado Supreme Court held that the photographs were admissible under the reporting statute, despite the fact that police solicited them. *Id.* at 22–23.

■ ¶ 24 Second, the plain language of section 12–36–135(1)(a) requires a physician to report any injury that he "has reason to believe involves a criminal act." Nothing in the language of the statute or its context suggests the legislature intended to limit this duty to situations in which a physician believes an injury was caused by someone other than his patient's criminal act. Because the statutory language is clear, we look no further. See *Young v. Brighton Sch. Dist., 27J*, 2014 CO 32, ¶ 11, 325 P.3d 571. Nor can we agree with the special concurrence's conclusion that the record does not support a basis for a reasonable belief by the attending physician that defendant's injury involved or related to a criminal act. The statute plainly requires the reporting of "any other injury that the [physician] has *reason to believe* involves a criminal act." § 12–36135(1)(a) (emphasis added). To the extent that the special concurrence suggests that defendant's injury "is not one of" the statute's specified injuries "triggering the duty to report" such as bullet wounds, knife wounds, dangerous dog bites, and domestic abuse, we disagree. The statute has a broad reach and triggers the duty to report any injury that the physician has reason to believe involved a crime. The facts here, in our view, support a reasonable belief.

¶ 25 Our conclusion is also consistent with the way we have applied other reporting statutes. The abrogation of the physician-patient privilege in section 12–36–135(3) follows along the same lines as the abrogation of privileges regarding reports of child abuse or neglect. *Covington*, 19 P.3d at 22. In one such case, a division of this court held that section 19–3–304, C.R.S.2014, which requires physicians and other professionals to report incidents of child abuse or neglect, applies to information received from defendants, as well as from victims or witnesses. *People v. Jimenez*, 217 P.3d 841, 854 (Colo.App.2008). We see no reason to apply section 1236–135 differently.

¶ 26 Because we conclude that Dr. Stafford's testimony was admissible under the reporting statute, we need not decide whether defendant waived the physician-patient privilege.

■ ¶ 27 Even if the physician-patient privilege barred Dr. Stafford's testimony, any error in admitting the testimony was harmless. As noted above, Officer Lesh

found defendant hiding in the victim's bushes shortly after she saw a man matching his description standing on her roof, trying to enter her window. Defendant was clearly injured and gave Officer Lesh an unlikely explanation for his conduct. Even without Dr. Stafford's testimony, the most logical inference from the evidence is that defendant was the person the victim saw at her window. Because we cannot conclude that Dr. Stafford's testimony "substantially influenced the verdict or affected the fairness of the trial," any error in admitting his testimony was harmless. *See Hagos,* ¶ 12.

## IV. Restitution

¶ 28 Last, defendant claims the district court erred when it ordered restitution of $489 for the cost of installing bars on the victim's bathroom window because there was no showing that defendant's conduct proximately caused the expense. Because we believe there are inadequate findings to support the restitution order, we agree and remand with directions to vacate that part of the order awarding the cost of installing the bars.

### A. Standard of Review

¶ 29 The district court has broad discretion to determine the terms of a restitution order and its ruling will not be disturbed absent an abuse of discretion. *People v. Rivera,* 250 P.3d 1272, 1274 (Colo.App. 2010); *People in Interest of D.W.,* 232 P.3d 182, 183 (Colo.App.2009).

### B. Relevant Law

¶ 30 Every order of conviction must include consideration of restitution. *See* § 18–1.3–603(1), C.R.S.2014. The prosecution bears the burden of establishing the amount of restitution by a preponderance of the evidence. *D.W.,* 232 P.3d at 183.

¶ 31 Section 18–1.3–602(3)(a), C.R.S.2014, defines "restitution" as:

[A]ny pecuniary loss suffered by a victim and includes but is not limited to all out-of-pocket expenses, interest, loss of use of money, anticipated future expenses, rewards paid by victims, money advanced by law enforcement agencies, money advanced by a governmental agency for a service animal, adjustment expenses, and other losses or injuries proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money. "Restitution" does not include damages for physical or mental pain and suffering, loss of consortium, loss of enjoyment of life, loss of future earnings, or punitive damages.

¶ 32 A restitution order may include a loss not specifically mentioned in the statute only if it was proximately caused by the offender's conduct. *See Rivera,* 250 P.3d at 1274. "Proximate cause" for purposes of restitution is "a cause which in natural and probable sequence produced the claimed injury" and "without which the injury would not have been sustained." *People v. Reyes,* 166 P.3d 301, 303 (Colo.App.2007) (quoting *People v. Bryant,* 122 P.3d 1026, 1027 (Colo. App.2005)). It is especially important for the trial court to consider whether proximate cause exists when a victim seeks restitution for a loss that is attenuated from the defendant's conduct. *Rivera,* 250 P.3d at 1274.

¶ 33 Expenses a victim incurred to avoid or mitigate a specific and ongoing threat related to the defendant's unlawful conduct qualify as restitution under section 18–1.3–602(3)(a), but expenses resulting from a general feeling of insecurity are too attenuated to qualify. *D.W.,* 232 P.3d at 185.

### C. Analysis

¶ 34 The district court ordered defendant to pay the cost of installing bars on the victim's window without finding the expense was the result of a specific, ongoing threat related to defendant's conduct as opposed to a general feeling of insecurity. Without this finding, and in the absence of any evidence in the record that would support this conclusion, we must vacate this part of the restitution order.

¶ 35 Four cases by divisions of this court guide our analysis. First, in *People v. Trujillo,* the defendant was convicted of second degree burglary, and the court ordered restitution for the cost of installing a burglar

alarm. 75 P.3d 1133, 1139 (Colo.App.2003), *abrogated on other grounds by Blakely v. Washington,* 542 U.S. 296, ·124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The division reversed the restitution order, holding that the district court's findings were not sufficient to conclude the decision to install the alarm was proximately caused by the defendant's conduct rather than the victim's general feeling of insecurity. *Id.* at 1140–41. In reaching this conclusion, the division noted that while the victim experienced a diminished feeling of security after the crime, "[t]his loss may be common to most victims of crime, and it is not, under ordinary circumstances, a loss that can be reasonably calculated and recompensed in money." *Id.* at 1140 (internal quotation marks omitted).

· ¶ 36 Second, in *Bryant,* 122 P.3d 1026, the defendant was convicted of attempted extortion and the court ordered restitution for the victim's moving expenses. *Id.* at 1027. The division affirmed, emphasizing the importance of the court's findings and noting, "the trial court here found that unlike the generalized feeling of insecurity in *Trujillo,* the victim's loss was caused by a specific threat that was still outstanding." *Id.* at 1028 (internal quotation marks omitted).

¶ 37 Third, in *Reyes,* 166 P.3d 301, the defendant was convicted of attempted second degree burglary and the court ordered restitution for the cost of installing locks on the victim-business's interior doors. *Id.* at 302. The prosecution argued that the defendant posed an ongoing and specific threat to the victim because the court sentenced him to probation rather than imprisonment. *Id.* at 304. The division rejected this argument as speculative and reversed the restitution order, noting the defendant had no prior connection to the victim, no prior criminal record, that his conduct was a random act by an intoxicated person, and that he "subsequently sent a letter to the victim apologizing for his actions." *Id.*

¶ 38 Fourth, in *D.W.,* 232 P.3d 182, the juvenile was adjudicated for sexual assault on a child and the court ordered restitution for expenses the victim's family incurred when it sold its house so the victim would no longer live near the juvenile. *Id.* at 183. In reversing the restitution order, the division held that the prosecution failed to prove the victim faced a specific and ongoing threat sufficient to require relocation, and therefore failed to show the expenditures were proximately caused by the defendant's conduct. *Id.* at 185–86.

¶ 39 Like the expenses in *Trujillo, Bryant, Reyes,* and *D.W.,* the cost of installing bars on the victim's window was occasioned by, but somewhat attenuated from, the defendant's criminal conduct. Under these circumstances, the district court must make detailed findings, supported by the record, that the expenses were the result of a specific and ongoing threat related to the offender's conduct rather than a general feeling of insecurity. *See D.W.,* 232 P.3d at 185; *see also Trujillo,* 75 P.3d at 1140 ("When the loss is attenuated from the offender's conduct, application of the definition of restitution becomes more difficult and may require more precise findings to justify the restitution order."). The district court made no such findings. Rather, it simply stated:

> I'm going to order the restitution. I think it's reasonably connected, too. When you take all the facts and circumstances of the case, the totality of the circumstances, I don't think it's a reach for, I think it's connected and causally connected and there's a reasonable amount. It's not excessive, and I'm also going to order the, also going to order the costs of prosecution, $68 as requested.

Neither the district court's findings nor the victim's statements at the sentencing hearing give us any basis to conclude the victim installed bars on her window because of an · ongoing threat related to defendant's conduct as opposed to a general feeling of insecurity following the crime. The People ask us to speculate that defendant presents an ongoing risk to the victim because he remains in the community, but we cannot base a restitution order on mere speculation. *See Reyes,* 166 P.3d at 304.

¶ 40 On this record, we cannot conclude the district court exercised its discretion appropriately when it ordered defendant to pay restitution for the cost of installing the bars. Accordingly, this part of the restitution order

is vacated and the case is remanded to the district court with directions to vacate that part of the order.

## V. Conclusion

¶ 41 For the reasons set forth above, we affirm defendant's convictions, vacate the restitution order in part, and remand this case to the district court with directions to vacate that part of the restitution order awarding the costs of installing bars on the bathroom window.

JUDGE BOORAS concurs.

JUDGE LICHTENSTEIN specially concurs.

JUDGE LICHTENSTEIN specially concurring.

¶ 42 I agree with Parts II and IV of the majority's opinion. I write separately with regard to Part III because I am not convinced that Dr. Stafford's testimony about defendant's injury was permitted under the reporting statute's exception to the physician-patient privilege. See § 12–36–135(3), C.R.S.2014. However, I agree with the majority that any error in the admission of the testimony was harmless.

¶ 43 As pertinent here, the reporting statute requires a physician who treats an injury "to report the injury at once to the police," if he or she "has reason to believe [the injury] involves a criminal act." § 12–36–135(1)(a).

¶ 44 When the physician has a duty to report the injury, the legislature has determined that the reporting physician may testify about the injury without first obtaining the patient's consent. § 1236–135(3). Under this provision, a physician "who makes a report pursuant to subsection (1) of this section shall not be subject to the physician-patient relationship described in section 13–90–107(1)(d), C.R.S., as to the medical examination and diagnosis." § 12–36135(3).

¶ 45 I do not join the majority's conclusion that Dr. Stafford was permitted to testify about the injury pursuant to section 12–

36135(3), because I am not persuaded that the nature of defendant's injury (and any circumstances reported to the doctor about how the injury was inflicted) triggered the physician's duty to report. And, although defendant was brought to the hospital in police custody, I cannot discern from the statute that this circumstance, without more, would trigger a duty to report an otherwise unreportable injury that was already known to police.

¶ 46 Some injuries, by their very nature, must be reported. § 1236–135(1) (injuries triggering the duty to report include bullet wounds, gunshot wounds, powder burns, other injuries caused by a knife or other sharp instrument, bites from dangerous dogs, and injuries from domestic violence). But defendant's injury, a fractured heel, is not one of them.

¶ 47 The statute also requires the reporting of other injuries that a physician "has reason to believe involve[ ] a criminal act." Id. For example, a doctor may have a reason to believe that an inherently unsuspicious injury involves a criminal act based on the report to the doctor about how the injury was incurred. See An Act Concerning the Mandatory Reporting of Domestic Abuse by Physicians: Hearing on H.B. 95–1114 Before the S. Judiciary Comm., 60th Gen. Assemb., 1st Reg. Sess. (Feb. 28, 1995) (statement of Sen. Donald J. Mares [1]). But there is no evidence in this record that the doctor believed that defendant's injury fell into this category, such that he was required "to report the injury at once to the police." The doctor testified that broken heel injuries are "relatively common" and he has seen "quite a few patients with this type of injury." And the record does not include any evidence that the police officer—or the defendant—told the doctor how or when defendant sustained the injury, or whether it was sustained during a criminal act. Thus, neither the nature of the injury, nor the information about how it was incurred, triggered a duty to report.

¶ 48 The majority relies on the fact of police custody as providing the "reason to

---

1. Senator Mares acknowledged that the duty to report domestic violence injuries would arise when a doctor notices "those bruises look pretty

darn suspect" and the victim admits that "this man ... hit me."

believe" that the injury "involve[d] a criminal act." But, police custody may arise from a recent arrest on a warrant for an older crime, or an arrest for an outstanding bench warrant, as well as an arrest for recent criminal activity. Thus, the mere fact of custody did not provide the doctor with any information whether the injury involved a criminal act. Under the circumstances of this case, where the injury or information about it do not separately trigger the duty to report, *cf. People v. Covington,* 19 P.3d 15, 21 n.5 (Colo. 2001), I cannot discern from a plain reading of the statute any legislative intent that police custody, alone, triggers the statutory duty to report.

¶ 49 If anything, the legislative hearings on the enactment and amendments to the reporting statute suggest that the mere fact of custody would not create a duty to report. By enacting subsection (1), the General Assembly intended that physicians would report injuries to the police and, as a result, that suspects and victims of crimes would come to law enforcement's attention. *An Act Concerning the Reporting by Physicians of Injuries Caused by Weapons: Hearing on H.B. 79–1366 Before the S.,* 52d Gen. Assemb., 1st Reg. Sess. (Apr. 13, 1979); *An Act Concerning the Mandatory Reporting of Domestic Abuse by Physicians: Hearing on H.B. 95–1114 Before the H. Judiciary Comm.,* 60th Gen. Assemb., 1st Reg. Sess. (Feb. 2, 1995) (statement of Rep. Glenda Swanson Lyle [2]); *An Act Concerning the Mandatory Reporting of Domestic Abuse by Physicians: Hearing on H.B. 95–1114 Before the S. Judiciary Comm.,* 60th Gen. Assemb., 1st Reg. Sess. (Feb. 28, 1995) (statement of Sen. Donald J. Mares [3]). The legislative purpose underlying subsection (1)'s duty to report would not be furthered under the circumstances of this

case because defendant and his injury were already known to police. *See People v. Dinkel,* 2013 COA 19, ¶ 6, 321 P.3d 569 ("Our task in construing a statute is to ascertain and give effect to the intent of the General Assembly.").

¶ 50 By adding subsection (3) to the reporting statute, the General Assembly ensured that when a doctor made the statutorily required report, that doctor could be called at trial to testify about that injury. Otherwise, "[w]ithout the physician's ability to testify concerning bare medical information, the duty to report was hollow." *Covington,* 19 P.3d at 22; *see also An Act Concerning Provisions for the Purpose of Enhancing the Substantive Criminal Laws: Hearing on H.B. 95–1070 Before the H. Judiciary Comm.,* 60th Gen. Assemb., 1st Reg. Sess. (Jan. 17, 1995) (statement of Ray Slaughter, Director of the Colorado District Attorneys' Council [4]).

¶ 51 Because I am not persuaded that Dr. Stafford was statutorily required to report this injury, I do not join the majority's conclusion that the reporting statute applies to this case to abrogate the physician-patient privilege. Accordingly, I would conclude that the testimony is privileged and the trial court erred in allowing Dr. Stafford's testimony about defendant's injury. I agree with the majority, however, that any error in the admission of the testimony was harmless.

---

2. Representative Lyle explained to the legislators that the purpose of the amendment "is to improve the probability that incidents of domestic abuse are reported to law enforcement authorities."

3. Senator Mares clarified that the purpose of the statute was "you have a guy coming in to the hospital with a knife in his back, ... they could be a victim, ... [or] somebody was just shooting at the police and got shot and is headed to the hospital and we want to be able to find the criminal."

4. Mr. Slaughter explained to the legislators that "[t]he physician-patient privilege is what we're talking about here. [Section] 12–36135 mandates reports by doctors to law enforcement in certain types of situations. Mandatory reports of bullet wounds, gunshot wounds, powder burns, knife wounds, ice pick wounds, and other sharp instrument wounds. Doctors have to report to the police. What we're running into is that those same doctors never make it to the stand...."