22CA1591 Peo v Castorena 10-24-2024 modified

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1591
Adams County District Court No. 20CR1055
Honorable Robert W. Kiesnowski, Jr., Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Juan Manuel Castorena,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LUM
Freyre and Grove, JJ., concur

Opinion Modified On the Court's Own Motion
and Petition for Rehearing <u>DENIED</u>

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

---

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

OPINION is modified as follows:

**Page 3, ¶ 8 currently reads:**

The suppression hearing took place in early 2020, about two years after the shooting.

**Opinion now reads:**

The suppression hearing took place in early 2022, about four years after the shooting.

**Page 6, ¶ 17 currently reads:**

The suppression hearing took place at the beginning of 2020, two years after the shooting.

**Opinion now reads:**

The suppression hearing took place at the beginning of 2022, four years after the shooting.

¶ 1     Defendant, Juan Manuel Castorena, appeals his judgment of conviction for first degree murder.  He argues that the district court reversibly erred by denying his motion to suppress a witness's out-of-court identification and prohibiting the admission of the witness's prior inconsistent testimony.  Because we agree with Castorena's first contention, we need not reach the second.  We reverse and remand for a new trial.

## I.     Background

¶ 2     One night, a Facebook account linked to Castorena messaged the victim with instructions to meet at the mailboxes near the parking lot of the victim's apartment complex.  Around the time of the Facebook messages, multiple witnesses saw two men attacking the victim in the parking lot.  They left the victim on the ground and walked back towards their car, which was parked near the mailboxes.  One witness saw the victim get up and begin following the assailants toward the mailboxes.

¶ 3     Araceli Puebla heard the altercation and walked to the front of her building to see what was going on.  She saw a man exit from the passenger side of a car parked near the mailboxes, draw a gun, and

shoot the victim. None of the other witnesses saw who the shooter was. Puebla gave descriptions of the shooter to police officers that night. Several months later, a different officer showed her a six-person photo array, from which she identified Castorena as the shooter.

¶ 4     Before trial, Castorena moved to suppress Puebla's out-of-court identification. While the district court found the photo array impermissibly suggestive, it denied the motion to suppress because it concluded that Puebla's identification was otherwise sufficiently reliable.

¶ 5     At trial, Castorena's defense was that he wasn't the shooter and that Puebla's out-of-court identification wasn't reliable. Castorena didn't testify. On direct examination, Puebla testified that she didn't see the shooter in the courtroom. Castorena extensively cross-examined Puebla regarding inconsistencies in her testimony and interviews with police about the events on the night the victim was shot. The officer who had conducted the photo array identification testified that Puebla identified Castorena as the

2

shooter in a photo lineup. The photo array with Puebla's initials by Castorena's photo was admitted into evidence.

¶ 6     The jury found Castorena guilty of first degree murder. He now appeals.

## II.     Out-of-Court Photo Identification

¶ 7     Castorena argues that the district court erred by not suppressing Puebla's out-of-court photo identification because the identification wasn't sufficiently reliable to overcome the suggestiveness of the photo array. We agree.

### A.     Additional Facts

¶ 8     The suppression hearing took place in early 2022, about four years after the shooting. The following evidence was presented about Puebla's various descriptions of the shooter and the photo identification:

#### 1.     Night of the Shooting

¶ 9     Immediately after the shooting, Officer Mark Jarvis interviewed Puebla in her apartment. Puebla spoke Spanish, and her daughter translated. Puebla said she saw the shooting and that the shooter was the passenger of the car that was parked at the mailboxes

during the altercation. She described the shooter as a heavyset, Hispanic male.

¶ 10 Detective Scott Mehle interviewed Puebla later that same night at a police station.[1] Puebla's daughter again translated. Puebla told Detective Mehle that it was dark out when she saw the victim arguing with the tall, skinny driver of the car parked by the mailboxes. Puebla watched from the sidewalk along the apartment complex's parking lot. Initially, the shooter was in the passenger seat of the parked car, but Puebla saw the shooter get out of the car, take a gun out of his waistband, and shoot the victim.

¶ 11 Puebla told Detective Mehle that the shooter directly faced her several times. She also said that the parking lot was well lit from surrounding street lights and lighting on surrounding buildings.

---

[1] Neither Officer Jarvis nor Detective Mehle testified at the suppression hearing. Rather, Detective Steve Sanders testified about the content of Puebla's interviews based on Officer Jarvis's reports and video of Detective Mehle's interview. Detective Luis Lopez and another detective testified about conducting Puebla's out-of-court identification.

¶ 12    Puebla described the shooter as heavyset, short, round faced, and wearing a blue or dark-colored shirt.  She said the shooter was bald but then described his hair like Detective Mehle's, which was a "close shave."  She also said that the shooter was shorter than the driver and didn't have any facial hair.  Although somewhat unclear, the testimony suggests Puebla said that she did not know the shooter's race (although she might be able to identify the shooter's complexion).  She also told Detective Mehle that she wouldn't be able to identify his face.

¶ 13    After the interview, Puebla (through her daughter) wrote a statement saying that the shooter was "not white," chubby, bald, and wearing a black sweater.

## 2.    Photo Array Identification

¶ 14    Puebla's out-of-court photo identification took place in May 2018, about four months after the shooting.  Two weeks before the identification, Detective Luis Lopez, who spoke Spanish, contacted Puebla to obtain her description of the shooter.  She described the shooter as a Hispanic male with a round face and wearing a hoodie.

5

¶ 15　Detective Lopez went to Puebla's home for the identification. He brought a photo array of six photos, consisting of a photo of Castorena and five photos of other men of similar skin color and facial hair. Castorena's photo was taken from an unrelated booking. He was the only man in the photos wearing a hoodie, and the hood came up partially around his head.

¶ 16　After viewing the photos for four minutes, Puebla told Detective Lopez that Castorena looked "most like the person who [she] saw commit the homicide." On a scale of one to ten, with ten being "a perfect match," she described herself as being at an eight in certainty that Castorena's photo matched the shooter.

### 3.　Suppression Hearing Description

¶ 17　The suppression hearing took place at the beginning of 2022, four years after the shooting. Puebla estimated that she witnessed the altercation and shooting from forty feet away, close enough to hear the men at the mailboxes arguing. However, Detective Steve Sanders, the lead detective on the case, testified that the actual distance based on where Puebla said she was standing was closer to 100 feet. Puebla said she could see the incident because "[i]t was

6

very clear" due to lighting at the mailboxes, in the parking lot, and around the apartment buildings. Detective Sanders testified that, based on his personal experience, the parking lot was sufficiently lit to allow a person to recognize someone else at night.

¶ 18     Puebla watched the incident unfold for two minutes. Initially, the shooter sat in the passenger seat of the car. Puebla saw him outside the car for forty seconds, during which time he shot the victim. Puebla testified that she was "surprised" by the shooting, but she only felt scared after the fact. She said the shooter faced her during the shooting, and she described him as being tall, overweight, dark skinned, round faced, bearded, and with short hair.

¶ 19     Puebla also testified that the shooter was taller than the driver, even though this conflicted with the description she gave to Detective Mehle. She didn't recall telling the detectives on the night of the shooting that she would not be able to identify the shooter's face.

## B.    District Court's Ruling

¶ 20    The district court found that the men in the photo array all looked similar to one another.  Nevertheless, the court concluded that the photo array was impermissibly suggestive because, after Puebla told Detective Lopez that the shooter wore a hoodie, Castorena was the only person wearing a hoodie in the array.  The court was also concerned because Castorena's hoodie was drawn around his head so as to highlight him, "almost like a halo."

¶ 21    Nevertheless, the court further ruled that the People met their burden under the totality of the circumstances of showing that Puebla's identification was reliable.  The court noted that Puebla's inconsistent statements about whether the shooter was taller or shorter than the driver of the vehicle "weigh[ed] against a determination of reliability" but "did not, by itself, demonstrate a completely inaccurate recollection."  The court also found that Puebla observed the shooting from "either 40 or 100 feet away" and saw the shooter for about forty seconds.  The court concluded that forty seconds was "not too short a time to make a reliable determination of identity."  And despite the distance, the court

8

impliedly found that the area was sufficiently lit for Puebla to view the altercation and that she had a clear view of the shooter's face. The court also credited Puebla's "eight out of ten" confidence in selecting Castorena's photograph and concluded that the four month delay between the shooting and the identification would not "materially erode" a witness's memory.

## C.    Applicable Law

¶ 22    "Due process of law protects the accused against the introduction of evidence tainted by unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *People v. Plancarte*, 232 P.3d 186, 189 (Colo. App. 2009).

¶ 23    In *Bernal v. People*, the Colorado Supreme Court adopted a two-part test for determining if a defendant's due process rights are violated by the admission of an identification made during a photographic lineup. 44 P.3d 184, 191 (Colo. 2002); *see Plancarte*, 232 P.3d at 189. First, the defendant must demonstrate that the photo array was impermissibly suggestive. *Bernal*, 44 P.3d at 191. Relevant factors in determining whether the array is impermissibly suggestive include the size of the array, the manner of its

9

presentation by officers, and the details of the photographs themselves.  *Id.*

¶ 24    Second, if the array is impermissibly suggestive, the burden shifts to the prosecution to show that the "identification was nevertheless reliable under the totality of the circumstances." *People v. Campbell*, 2018 COA 5, ¶ 55.  To determine reliability, courts consider the following factors:

> (1)    the opportunity of the witness to view the criminal at the time of the crime;
>
> (2)    the witness's degree of attention;
>
> (3)    the accuracy of the witness's prior description of the criminal;
>
> (4)    the level of certainty demonstrated by the witness at the confrontation; and
>
> (5)    the length of time between the crime and the confrontation.

*Bernal*, 44 P.3d at 192.

¶ 25    "Ultimately, the suggestiveness of the identification procedure must be balanced against the indicia of reliability; provided that

there is not a 'very substantial likelihood of irreparable misidentification,' the identification is admissible." *Campbell*, ¶ 56 (quoting *Bernal*, 44 P.3d at 192).

### D.    Standard of Review

¶ 26    We review the constitutionality of pretrial identification procedures as a mixed question of law and fact. *Bernal*, 44 P.3d at 190. We defer to the district court's factual findings but review its legal conclusions de novo. *Plancarte*, 232 P.3d at 189. Thus, while affording deference to the district court's findings of fact, we may weigh those facts differently and reach a different conclusion. *Bernal*, 44 P.3d at 190.

### E.    Suggestiveness (Alternative Grounds to Affirm)

¶ 27    Initially, we decline the People's invitation to affirm the district court's ruling on the grounds that the photo array wasn't suggestive (and that the district court erred by finding it was). While the facial features of the men in the photos were all similar, Castorena's hoodie made his photo noticeably stand out from the others. *Id.* at 191. Moreover, even though Puebla described the shooter's clothing inconsistently, the hoodie featured in the only description she gave close in time to the photo lineup. Thus, regardless of the

11

description's accuracy, the hoodie rendered Castorena's photo "unique in a manner directly related to an important identification factor." *Id.* at 192. Accordingly, we agree with the district court that the photo array was impermissibly suggestive.

## F. Reliability Analysis

¶ 28    Castorena contends that the district court erred by determining that the prosecution had proved that Puebla's out-of-court identification was reliable. Applying the *Bernal* factors, we agree.

### 1. Opportunity to View

¶ 29    The record supports the district court's findings about the length of time Puebla saw the shooter (forty seconds); and that she was positioned to get a clear view of the shooter's face. The record also supports the court's implied finding that the area was sufficiently lit for Puebla to view the altercation.

¶ 30    We conclude that the length of time and positioning favor reliability. Forty seconds is a relatively long time to observe someone, particularly given Puebla's testimony that the shooter looked directly at her several times. Indeed, identifications based on observations as short as a few seconds have been found reliable.

12

*See United States v. Gallegos*, 111 F.4th 1068, 1083-84 (10th Cir. 2024) (collecting cases indicating that "identification testimony — even though based on seconds-long observations — can be reliable"); *Campbell*, ¶ 58 (upholding identification as reliable when a witness saw the suspect for "one or two seconds in a well-lit area").

¶ 31 However, the district court didn't resolve the conflicting testimony about Puebla's distance from the shooter (40 or 100 feet), and it's unclear what weight (if any) the court put on distance. We have found a few cases upholding identifications made from twenty to fifty feet away, but those cases involved daylight conditions. *See Gallegos*, 111 F.4th at 1084-85 (witness viewed the suspect from twenty to forty feet away in "broad daylight"); *Brisco v. Ercole*, 565 F.3d 80, 83, 93 (2d. Cir. 2009) (witness viewed the suspect from "fifteen to fifty" feet away at 11:30 a.m.). In contrast, while the parking lot here was lit enough for Puebla to "view the altercation," the encounter nevertheless took place at nighttime, and Puebla told Detective Mehle that it was too dark to see if the windows of the car

13

were tinted or not.[2]  Moreover, the People don't cite, and we haven't found, any case upholding an identification from more than fifty feet away (much less one made at 100 feet) in any lighting conditions.

¶ 32    We conclude that the distance, combined with the "sufficient" but less-than-optimal lighting conditions, significantly undercuts the weight that the viewing time and positioning would otherwise give to this factor.  On balance, this factor is neutral.

### 2.    Degree of Attention

¶ 33    This factor is neutral.  While Puebla paid attention to the altercation and the shooting, any possible reliability boost is greatly diminished by Puebla's statement to Detective Mehle that she wouldn't be able to recognize the shooter's face.

---

[2] While we acknowledge Detective Sanders' testimony that nighttime lighting would have allowed a person to "recognize somebody that's walking through the parking lot," he wasn't asked if it would be possible to do so from any particular distance away.

### 3. Accuracy of Prior Description

¶ 34    Throughout her descriptions of the shooter, Puebla consistently identified that he was heavyset with a round face. These features match Castorena, who is described in police records as being five feet, five inches tall and 280 pounds and who appears to have a round face in his lineup photo and in photos of him introduced at trial. However, Puebla's descriptions of all other features — hair, facial hair, race, clothing, and height — have been inconsistent:

- The shooter's race varied between unknown, a mix between white and Hispanic, and Hispanic.

- Puebla variously described the shooter as bald or with short hair.

- Although Puebla told Detective Mehle that the shooter didn't have facial hair, she described him at the suppression hearing as having a beard.

- Puebla variously described the shooter's clothing as a dark blue shirt, a black sweater, and a hoodie.

- Puebla described the driver of the car as being taller than the shooter in her interview with Detective Mehle, but in the suppression hearing, she said that the driver was shorter than the shooter.

¶ 35    In addition to being inconsistent, we can't discern the accuracy of Puebla's descriptions with respect to Castorena's hair, facial hair, and clothing.  All three features can be easily (and relatively quickly) changed, and the record doesn't reflect what Castorena's hair, facial hair, or clothing actually looked like on the night of the shooting.  And for the characteristics for which we can discern accuracy — particularly Castorena's height relative to the driver of the car — the discrepancies are troubling.

¶ 36    For these reasons, this factor weighs slightly against reliability.

#### 4.    Level of Certainty

¶ 37    The district court weighed this factor in favor of reliability because of Puebla's eighty percent confidence rating.  It credited Puebla as "reasonabl[y] confiden[t]" in her photo selection and noted that her confidence didn't waver at the suppression hearing.

16

¶ 38    We place little weight on this factor in this case.  Although Puebla asserted that her confidence level was relatively high, it's difficult to tell how much of that confidence was attributable to the suggestive nature of the photo array, particularly given Puebla's statement on the night of the shooting that she wouldn't be able to identify the shooter's face.  And unlike the district court, we don't accord much weight to Puebla's perceived confidence during the suppression hearing because she displayed the same level of confidence while testifying *inaccurately* about the details of her prior statements to law enforcement officials.

                    5.    Time Between Crime and Confrontation

¶ 39    The fact that several months passed between the crime and Puebla's identification weighs against reliability.  *Cf. Manson v. Brathwaite*, 432 U.S. 98, 115-16 (1977) (noting that the officer's photographic identification taking place only two days after the crime favored reliability because it was not "the *passage of weeks or months* between the crime and the viewing of the photograph") (emphasis added).

### 6. Balancing Suggestiveness and Reliability Factors

¶ 40    In sum, we conclude that none of the factors weigh in favor of reliability. The factors are either neutral (viewing conditions and degree of attention), unweighted (confidence), or weigh against or slightly against reliability (accuracy and time). It is the prosecution's burden to prove that, under the totality of the circumstances, the suggestive procedure didn't create a "very substantial likelihood of misidentification." *Bernal*, 44 P.3d at 192. We conclude the prosecution didn't meet that burden in this case.

### III. Constitutional Harmless Error

¶ 41    Because the admission of a suggestive identification impacts Castorena's constitutional rights and because Castorena preserved the error for review, it is subject to a constitutional harmless error analysis. *People v. Martinez*, 2015 COA 37, ¶ 10. To be constitutionally harmless error, the court "must be confident beyond a reasonable doubt that the error did not contribute to the guilty verdict." *Bernal*, 44 P.3d at 200.

¶ 42    The People argue that any error in declining to suppress the photo line up is harmless beyond a reasonable doubt. We disagree. Castorena's primary defense was that someone else was the

shooter. While other witnesses and evidence placed Castorena at the apartment complex that evening and linked him to the fight with the victim, Puebla's out-of-court identification was the only evidence that Castorena — and not the driver or anyone else — had shot the victim. Although Castorena extensively cross-examined Puebla about her identification and inconsistent descriptions, we cannot conclude, under these circumstances, that the guilty verdict is "surely unattributable" the suppression error. *Id.* at 201.

## IV. Disposition

¶ 43 We reverse the judgment of conviction and remand for a new trial.

JUDGE FREYRE and JUDGE GROVE concur.

22CA1591 Peo v Castorena 10-24-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1591
Adams County District Court No. 20CR1055
Honorable Robert W. Kiesnowski, Jr., Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Juan Manuel Castorena,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LUM
Freyre and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

---

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Juan Manuel Castorena, appeals his judgment of conviction for first degree murder.  He argues that the district court reversibly erred by denying his motion to suppress a witness's out-of-court identification and prohibiting the admission of the witness's prior inconsistent testimony.  Because we agree with Castorena's first contention, we need not reach the second.  We reverse and remand for a new trial.

## I.     Background

¶ 2     One night, a Facebook account linked to Castorena messaged the victim with instructions to meet at the mailboxes near the parking lot of the victim's apartment complex.  Around the time of the Facebook messages, multiple witnesses saw two men attacking the victim in the parking lot.  They left the victim on the ground and walked back towards their car, which was parked near the mailboxes.  One witness saw the victim get up and begin following the assailants toward the mailboxes.

¶ 3     Araceli Puebla heard the altercation and walked to the front of her building to see what was going on.  She saw a man exit from the passenger side of a car parked near the mailboxes, draw a gun, and

1

shoot the victim. None of the other witnesses saw who the shooter was. Puebla gave descriptions of the shooter to police officers that night. Several months later, a different officer showed her a six-person photo array, from which she identified Castorena as the shooter.

¶ 4    Before trial, Castorena moved to suppress Puebla's out-of-court identification. While the district court found the photo array impermissibly suggestive, it denied the motion to suppress because it concluded that Puebla's identification was otherwise sufficiently reliable.

¶ 5    At trial, Castorena's defense was that he wasn't the shooter and that Puebla's out-of-court identification wasn't reliable. Castorena didn't testify. On direct examination, Puebla testified that she didn't see the shooter in the courtroom. Castorena extensively cross-examined Puebla regarding inconsistencies in her testimony and interviews with police about the events on the night the victim was shot. The officer who had conducted the photo array identification testified that Puebla identified Castorena as the

shooter in a photo lineup. The photo array with Puebla's initials by Castorena's photo was admitted into evidence.

¶ 6    The jury found Castorena guilty of first degree murder. He now appeals.

## II.    Out-of-Court Photo Identification

¶ 7    Castorena argues that the district court erred by not suppressing Puebla's out-of-court photo identification because the identification wasn't sufficiently reliable to overcome the suggestiveness of the photo array. We agree.

### A.    Additional Facts

¶ 8    The suppression hearing took place in early 2020, about two years after the shooting. The following evidence was presented about Puebla's various descriptions of the shooter and the photo identification:

#### 1.    Night of the Shooting

¶ 9    Immediately after the shooting, Officer Mark Jarvis interviewed Puebla in her apartment. Puebla spoke Spanish, and her daughter translated. Puebla said she saw the shooting and that the shooter was the passenger of the car that was parked at the mailboxes

3

during the altercation.  She described the shooter as a heavyset, Hispanic male.

¶ 10    Detective Scott Mehle interviewed Puebla later that same night at a police station.[1]  Puebla's daughter again translated.  Puebla told Detective Mehle that it was dark out when she saw the victim arguing with the tall, skinny driver of the car parked by the mailboxes.  Puebla watched from the sidewalk along the apartment complex's parking lot.  Initially, the shooter was in the passenger seat of the parked car, but Puebla saw the shooter get out of the car, take a gun out of his waistband, and shoot the victim.

¶ 11    Puebla told Detective Mehle that the shooter directly faced her several times.  She also said that the parking lot was well lit from surrounding street lights and lighting on surrounding buildings.

---

[1] Neither Officer Jarvis nor Detective Mehle testified at the suppression hearing.  Rather, Detective Steve Sanders testified about the content of Puebla's interviews based on Officer Jarvis's reports and video of Detective Mehle's interview.  Detective Luis Lopez and another detective testified about conducting Puebla's out-of-court identification.

¶ 12     Puebla described the shooter as heavyset, short, round faced, and wearing a blue or dark-colored shirt.  She said the shooter was bald but then described his hair like Detective Mehle's, which was a "close shave."  She also said that the shooter was shorter than the driver and didn't have any facial hair.  Although somewhat unclear, the testimony suggests Puebla said that she did not know the shooter's race (although she might be able to identify the shooter's complexion).  She also told Detective Mehle that she wouldn't be able to identify his face.

¶ 13     After the interview, Puebla (through her daughter) wrote a statement saying that the shooter was "not white," chubby, bald, and wearing a black sweater.

## 2.     Photo Array Identification

¶ 14     Puebla's out-of-court photo identification took place in May 2018, about four months after the shooting.  Two weeks before the identification, Detective Luis Lopez, who spoke Spanish, contacted Puebla to obtain her description of the shooter.  She described the shooter as a Hispanic male with a round face and wearing a hoodie.

5

¶ 15    Detective Lopez went to Puebla's home for the identification. He brought a photo array of six photos, consisting of a photo of Castorena and five photos of other men of similar skin color and facial hair. Castorena's photo was taken from an unrelated booking. He was the only man in the photos wearing a hoodie, and the hood came up partially around his head.

¶ 16    After viewing the photos for four minutes, Puebla told Detective Lopez that Castorena looked "most like the person who [she] saw commit the homicide." On a scale of one to ten, with ten being "a perfect match," she described herself as being at an eight in certainty that Castorena's photo matched the shooter.

### 3.    Suppression Hearing Description

¶ 17    The suppression hearing took place at the beginning of 2020, two years after the shooting. Puebla estimated that she witnessed the altercation and shooting from forty feet away, close enough to hear the men at the mailboxes arguing. However, Detective Steve Sanders, the lead detective on the case, testified that the actual distance based on where Puebla said she was standing was closer to 100 feet. Puebla said she could see the incident because "[i]t was

6

very clear" due to lighting at the mailboxes, in the parking lot, and around the apartment buildings. Detective Sanders testified that, based on his personal experience, the parking lot was sufficiently lit to allow a person to recognize someone else at night.

¶ 18    Puebla watched the incident unfold for two minutes. Initially, the shooter sat in the passenger seat of the car. Puebla saw him outside the car for forty seconds, during which time he shot the victim. Puebla testified that she was "surprised" by the shooting, but she only felt scared after the fact. She said the shooter faced her during the shooting, and she described him as being tall, overweight, dark skinned, round faced, bearded, and with short hair.

¶ 19    Puebla also testified that the shooter was taller than the driver, even though this conflicted with the description she gave to Detective Mehle. She didn't recall telling the detectives on the night of the shooting that she would not be able to identify the shooter's face.

## B. District Court's Ruling

¶ 20    The district court found that the men in the photo array all looked similar to one another. Nevertheless, the court concluded that the photo array was impermissibly suggestive because, after Puebla told Detective Lopez that the shooter wore a hoodie, Castorena was the only person wearing a hoodie in the array. The court was also concerned because Castorena's hoodie was drawn around his head so as to highlight him, "almost like a halo."

¶ 21    Nevertheless, the court further ruled that the People met their burden under the totality of the circumstances of showing that Puebla's identification was reliable. The court noted that Puebla's inconsistent statements about whether the shooter was taller or shorter than the driver of the vehicle "weigh[ed] against a determination of reliability" but "did not, by itself, demonstrate a completely inaccurate recollection." The court also found that Puebla observed the shooting from "either 40 or 100 feet away" and saw the shooter for about forty seconds. The court concluded that forty seconds was "not too short a time to make a reliable determination of identity." And despite the distance, the court

8

impliedly found that the area was sufficiently lit for Puebla to view the altercation and that she had a clear view of the shooter's face. The court also credited Puebla's "eight out of ten" confidence in selecting Castorena's photograph and concluded that the four month delay between the shooting and the identification would not "materially erode" a witness's memory.

## C.    Applicable Law

¶ 22    "Due process of law protects the accused against the introduction of evidence tainted by unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *People v. Plancarte*, 232 P.3d 186, 189 (Colo. App. 2009).

¶ 23    In *Bernal v. People*, the Colorado Supreme Court adopted a two-part test for determining if a defendant's due process rights are violated by the admission of an identification made during a photographic lineup.  44 P.3d 184, 191 (Colo. 2002); *see Plancarte*, 232 P.3d at 189.  First, the defendant must demonstrate that the photo array was impermissibly suggestive.  *Bernal*, 44 P.3d at 191.  Relevant factors in determining whether the array is impermissibly suggestive include the size of the array, the manner of its

9

presentation by officers, and the details of the photographs themselves. *Id.*

¶ 24 Second, if the array is impermissibly suggestive, the burden shifts to the prosecution to show that the "identification was nevertheless reliable under the totality of the circumstances." *People v. Campbell*, 2018 COA 5, ¶ 55. To determine reliability, courts consider the following factors:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness's degree of attention;

(3) the accuracy of the witness's prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the length of time between the crime and the confrontation.

*Bernal*, 44 P.3d at 192.

¶ 25 "Ultimately, the suggestiveness of the identification procedure must be balanced against the indicia of reliability; provided that

there is not a 'very substantial likelihood of irreparable misidentification,' the identification is admissible." *Campbell*, ¶ 56 (quoting *Bernal*, 44 P.3d at 192).

### D.    Standard of Review

¶ 26    We review the constitutionality of pretrial identification procedures as a mixed question of law and fact. *Bernal*, 44 P.3d at 190. We defer to the district court's factual findings but review its legal conclusions de novo. *Plancarte*, 232 P.3d at 189. Thus, while affording deference to the district court's findings of fact, we may weigh those facts differently and reach a different conclusion. *Bernal*, 44 P.3d at 190.

### E.    Suggestiveness (Alternative Grounds to Affirm)

¶ 27    Initially, we decline the People's invitation to affirm the district court's ruling on the grounds that the photo array wasn't suggestive (and that the district court erred by finding it was). While the facial features of the men in the photos were all similar, Castorena's hoodie made his photo noticeably stand out from the others. *Id.* at 191. Moreover, even though Puebla described the shooter's clothing inconsistently, the hoodie featured in the only description she gave close in time to the photo lineup. Thus, regardless of the

11

description's accuracy, the hoodie rendered Castorena's photo "unique in a manner directly related to an important identification factor." *Id.* at 192. Accordingly, we agree with the district court that the photo array was impermissibly suggestive.

### F.    Reliability Analysis

¶ 28    Castorena contends that the district court erred by determining that the prosecution had proved that Puebla's out-of-court identification was reliable. Applying the *Bernal* factors, we agree.

### 1.    Opportunity to View

¶ 29    The record supports the district court's findings about the length of time Puebla saw the shooter (forty seconds); and that she was positioned to get a clear view of the shooter's face. The record also supports the court's implied finding that the area was sufficiently lit for Puebla to view the altercation.

¶ 30    We conclude that the length of time and positioning favor reliability. Forty seconds is a relatively long time to observe someone, particularly given Puebla's testimony that the shooter looked directly at her several times. Indeed, identifications based on observations as short as a few seconds have been found reliable.

*See United States v. Gallegos*, 111 F.4th 1068, 1083-84 (10th Cir. 2024) (collecting cases indicating that "identification testimony — even though based on seconds-long observations — can be reliable"); *Campbell*, ¶ 58 (upholding identification as reliable when a witness saw the suspect for "one or two seconds in a well-lit area").

¶ 31 However, the district court didn't resolve the conflicting testimony about Puebla's distance from the shooter (40 or 100 feet), and it's unclear what weight (if any) the court put on distance. We have found a few cases upholding identifications made from twenty to fifty feet away, but those cases involved daylight conditions. *See Gallegos*, 111 F.4th at 1084-85 (witness viewed the suspect from twenty to forty feet away in "broad daylight"); *Brisco v. Ercole*, 565 F.3d 80, 83, 93 (2d. Cir. 2009) (witness viewed the suspect from "fifteen to fifty" feet away at 11:30 a.m.). In contrast, while the parking lot here was lit enough for Puebla to "view the altercation," the encounter nevertheless took place at nighttime, and Puebla told Detective Mehle that it was too dark to see if the windows of the car

13

were tinted or not.[2]  Moreover, the People don't cite, and we haven't found, any case upholding an identification from more than fifty feet away (much less one made at 100 feet) in any lighting conditions.

¶ 32    We conclude that the distance, combined with the "sufficient" but less-than-optimal lighting conditions, significantly undercuts the weight that the viewing time and positioning would otherwise give to this factor.  On balance, this factor is neutral.

### 2.    Degree of Attention

¶ 33    This factor is neutral.  While Puebla paid attention to the altercation and the shooting, any possible reliability boost is greatly diminished by Puebla's statement to Detective Mehle that she wouldn't be able to recognize the shooter's face.

---

[2] While we acknowledge Detective Sanders' testimony that nighttime lighting would have allowed a person to "recognize somebody that's walking through the parking lot," he wasn't asked if it would be possible to do so from any particular distance away.

### 3. Accuracy of Prior Description

¶ 34    Throughout her descriptions of the shooter, Puebla consistently identified that he was heavyset with a round face. These features match Castorena, who is described in police records as being five feet, five inches tall and 280 pounds and who appears to have a round face in his lineup photo and in photos of him introduced at trial. However, Puebla's descriptions of all other features — hair, facial hair, race, clothing, and height — have been inconsistent:

- The shooter's race varied between unknown, a mix between white and Hispanic, and Hispanic.

- Puebla variously described the shooter as bald or with short hair.

- Although Puebla told Detective Mehle that the shooter didn't have facial hair, she described him at the suppression hearing as having a beard.

- Puebla variously described the shooter's clothing as a dark blue shirt, a black sweater, and a hoodie.

15

- Puebla described the driver of the car as being taller than the shooter in her interview with Detective Mehle, but in the suppression hearing, she said that the driver was shorter than the shooter.

¶ 35    In addition to being inconsistent, we can't discern the accuracy of Puebla's descriptions with respect to Castorena's hair, facial hair, and clothing.  All three features can be easily (and relatively quickly) changed, and the record doesn't reflect what Castorena's hair, facial hair, or clothing actually looked like on the night of the shooting.  And for the characteristics for which we can discern accuracy — particularly Castorena's height relative to the driver of the car — the discrepancies are troubling.

¶ 36    For these reasons, this factor weighs slightly against reliability.

#### 4.    Level of Certainty

¶ 37    The district court weighed this factor in favor of reliability because of Puebla's eighty percent confidence rating.  It credited Puebla as "reasonabl[y] confiden[t]" in her photo selection and noted that her confidence didn't waver at the suppression hearing.

16

¶ 38 We place little weight on this factor in this case. Although Puebla asserted that her confidence level was relatively high, it's difficult to tell how much of that confidence was attributable to the suggestive nature of the photo array, particularly given Puebla's statement on the night of the shooting that she wouldn't be able to identify the shooter's face. And unlike the district court, we don't accord much weight to Puebla's perceived confidence during the suppression hearing because she displayed the same level of confidence while testifying *inaccurately* about the details of her prior statements to law enforcement officials.

### 5. Time Between Crime and Confrontation

¶ 39 The fact that several months passed between the crime and Puebla's identification weighs against reliability. *Cf. Manson v. Brathwaite*, 432 U.S. 98, 115-16 (1977) (noting that the officer's photographic identification taking place only two days after the crime favored reliability because it was not "the *passage of weeks or months* between the crime and the viewing of the photograph") (emphasis added).

### 6. Balancing Suggestiveness and Reliability Factors

¶ 40    In sum, we conclude that none of the factors weigh in favor of reliability. The factors are either neutral (viewing conditions and degree of attention), unweighted (confidence), or weigh against or slightly against reliability (accuracy and time). It is the prosecution's burden to prove that, under the totality of the circumstances, the suggestive procedure didn't create a "very substantial likelihood of misidentification." *Bernal*, 44 P.3d at 192. We conclude the prosecution didn't meet that burden in this case.

### III.    Constitutional Harmless Error

¶ 41    Because the admission of a suggestive identification impacts Castorena's constitutional rights and because Castorena preserved the error for review, it is subject to a constitutional harmless error analysis. *People v. Martinez*, 2015 COA 37, ¶ 10. To be constitutionally harmless error, the court "must be confident beyond a reasonable doubt that the error did not contribute to the guilty verdict." *Bernal*, 44 P.3d at 200.

¶ 42    The People argue that any error in declining to suppress the photo line up is harmless beyond a reasonable doubt. We disagree. Castorena's primary defense was that someone else was the

shooter. While other witnesses and evidence placed Castorena at the apartment complex that evening and linked him to the fight with the victim, Puebla's out-of-court identification was the only evidence that Castorena — and not the driver or anyone else — had shot the victim. Although Castorena extensively cross-examined Puebla about her identification and inconsistent descriptions, we cannot conclude, under these circumstances, that the guilty verdict is "surely unattributable" the suppression error. *Id.* at 201.

## IV.   Disposition

¶ 43     We reverse the judgment of conviction and remand for a new trial.

JUDGE FREYRE and JUDGE GROVE concur.